# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

MANUEL ROMAN CANEZ,

      Petitioner,

    v.

M.E. SPEARMAN,

      Respondent.

Case No. 1:17-cv-01192-LJO-SAB-HC

FINDINGS AND RECOMMENDATION RECOMMENDING DENIAL OF PETITION FOR WRIT OF HABEAS CORPUS

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

## I.

## BACKGROUND

On October 29, 2014, Petitioner was convicted after a jury trial in the Fresno County Superior Court of: two counts of arson of an inhabited structure, second-degree robbery, misdemeanor battery, three counts of corporal injury to a cohabitant, two counts of false imprisonment by violence, misdemeanor delaying a peace officer, and criminal threats. (4 CT[1] 1012–22). The trial court found true the strike and prior prison term allegations. (5 CT 1078; 18 RT[2] 2360–61). Petitioner was sentenced to an imprisonment term of thirty-nine years and four months. (5 CT 1105). On March 28, 2017, the California Court of Appeal, Fifth Appellate

---

[1] "CT" refers to the Clerk's Transcript on Appeal lodged by Respondent as Document Nos. 2–6 on January 10, 2018. (ECF No. 19).

[2] "RT" refers to the Reporter's Transcript on Appeal lodged by Respondent on January 10, 2018. (ECF No. 19).

District affirmed the judgment. <u>People v. Canez</u>, No. F070779, 2017 WL 1150703, at *15 (Cal. Ct. App. Mar. 28, 2017). The California Supreme Court denied Petitioner's petition for review on June 21, 2017. (LDs[3] 35, 36).

On September 5, 2017, Petitioner filed the instant federal petition for writ of habeas corpus. (ECF No. 1). Therein, Petitioner raises the following claims for relief: (1) destruction of evidence; (2) erroneous admission of hearsay evidence; (3) the trial court's failure to sua sponte instruct jury on a lesser-included offense; (4) discriminatory prosecution; and (5) ineffective assistance of counsel. Respondent has filed an answer, and Petitioner has filed a traverse. (ECF Nos. 18, 22).

## II.

## STATEMENT OF FACTS[4]

### A. Gettysburg apartment fire

In early 2010, Canez was living with his ex-wife Sylvia Bernal in her apartment at Gettysburg and Chestnut Avenues in Fresno. The two were in a dating relationship at the time. On January 21, 2010, during an argument, Canez repeatedly threatened to kill Bernal, telling her, at one point, "I am going to kill all of you motherfuckers." Bernal also noticed a knife in the back of Canez's waistband. Bernal testified, "I knew I was going to die that day."

Bernal cried the whole night, telling herself she had to get out of the situation. Canez drove her to work the next morning. Bernal testified, "So as soon as I got in [to work], I felt a relief, thank God I made it out of there." She called her daughter, Irene Meza, to ask her to tell Canez she would not be returning to the apartment. Bernal also asked Meza to call the police.

Canez left several phone messages for Bernal over the course of the day. In the messages, he threatened that Bernal was "going to pay" for her actions. He accused her of sexual liaisons with ni**ers[5] and said she had AIDS. He cursed her place of work, Pelco, stating, "Fuck Pelco." He also told Bernal he had "flushed her W–2 forms down the toilet like the piece of shit that she is."

Later in the day, Bernal was escorted to her apartment by two police officers and her daughter, Meza, to retrieve clothes for work. On arrival, they found the unit had been thoroughly vandalized. The TV was thrown against the wall and broken, the computer was thrown on the ground, family photographs were defaced with spray paint or smashed, the toilet was spray painted, and Bernal's W–2 forms were in the toilet, in pieces. Various phrases like "bitch," "fuck you," "Sylvia loves ni**ers," "ni**er, ni**er," "ni**er lover," and "Pelco, bitch, AIDS" had

---

[3] "LD" refers to the documents lodged by Respondent on January 10, 2018. (ECF No. 19).

[4] The Court relies on the California Court of Appeal's March 28, 2017 opinion for this summary of the facts of the crime. <u>See</u> <u>Vasquez v. Kirkland</u>, 572 F.3d 1029, 1031 n.1 (9th Cir. 2009).

[5] The court, refusing to use this grossly inflammatory term yet insisting on accuracy of the record, substitutes asterisks out of a sense of decency.

been spray-painted on the walls in Canez's writing. The entire place—couches, beds, walls, floors, ceiling, Bernal's Bible—was smeared with a transmission or gear oil that was kept in the closet. The place smelled of the oil too and the empty container of oil was left in the apartment.

While the group was in the apartment, Meza got a call from Canez and gave the phone to Officer Chris Taliaferro, one of the officers who had escorted Meza and Bernal to the apartment. Canez said he was calling to tell Bernal that their apartment had been trashed but he had nothing to do with it. Early the next morning, January 23, 2010, the apartment manager called Bernal to tell her that her apartment had "burned down."

On January 26, 2010, City of Fresno Deputy Fire Marshal and Investigations Supervisor Don MacAlpine, along with fire investigators Christine Wilson and Floyd Wilding, began an investigation into the cause of the fire, which was confined to Bernal's apartment. Investigator Wilson used a hydrocarbon detector to search for traces of accelerants like gasoline, kerosene, and flammable solvents. The detector signaled the presence of accelerant in three locations, one in the kitchen, one in the dining room, and one on the border between the dining and living rooms. Investigators took debris samples from these areas for purposes of chemical analysis. Chemical analysis could confirm the presence of an accelerant on the sample as well as identify the particular accelerant at issue. In this instance, laboratory testing apparently was not subsequently conducted on the samples collected by the investigators. However, Investigator Wilson estimated that she had utilized a hydrocarbon detector 600 times in fire investigations, and, in her experience, in only two cases had subsequent chemical analysis failed to confirm the presence of a specific accelerant.

MacAlpine testified about other aspects of the investigation. He first determined the fire started inside Bernal's apartment. He then examined the fire damage patterns within the apartment to determine precisely where the fire had ignited. He explained, "[T]hat whole area, the living room, dining room, kitchen was heavily involved, full room involvement. And then as one goes more down the apartment, and right now specifically the hallway, it is lessening in fire involvement." Based on the damage patterns, MacAlpine concluded the fire started simultaneously in the living room, dining room, and kitchen, and, from there, spread down the hallway going to the back of the apartment.

MacAlpine then looked for possible sources of ignition, ruling out any electrical short as a source of the fire. He eliminated the subpanel located in the bedroom, the water heater, electrical appliances, lights, and electrical outlets, as potential causes of the fire. MacAlpine also ruled out other accidental causes such as a burning candle or an electric spark. Finally, MacAlpine determined that a natural cause such as a lightning strike or improperly stored oily rags also were not contributing factors.

MacAlpine concluded the fire was deliberately started by a person and that the ignition source was an open flame device, such as a match or lighter; in other words, he concluded the cause of the fire was arson. Specifically, he stated: "So when we have a scene like this where we've been able to rule out accidental causes, natural causes, and were left with a willful, malicious cause or arson cause, and we have clear data evidence of an ignitable liquid, such as we did in this case, then it's most reasonable to conclude that the ignition source was something as simple as an open flame device, such as a lighter or matches, whether left behind or taken with the person that's responsible when they left."

Following the onsite investigation, MacAlpine and the other investigators interviewed neighbors and other witnesses, and based on all the information gathered, concluded Canez was responsible for setting the apartment on fire. MacAlpine also noted, based on his experience as a fire investigator, that domestic violence was "one of [the] more common motives of arson."

Canez's son, Manuel Canez, Jr., testified that he had a discussion about the Gettysburg apartment fire with his father in February or March 2010. Regarding that discussion, Canez, Jr. testified:

> "I didn't really ask him as far as like, did you do it. Like, I mean, it was just I knew in my heart he did it. So when I was telling him, it was kind of like we were talking about it, and I was like—I mean, because I haven't seen him since that fire had happened. And, I mean I didn't blame him or anything. But the way I was talking about it wasn't like, I know you did it. It was more like—kind of like, I mean, we lost everything."

Canez, Jr. testified that his dad did not make a particular statement about setting the fire, adding, "He didn't have to." When the prosecutor reminded Canez, Jr. of the latter's conversation with Fire Investigator Floyd Wilding in January 2011, Canez, Jr. recalled telling Wilding that Canez had told Canez, Jr., with respect to the Gettysburg apartment fire, "yeah, I did it, I can't believe I did that and I feel stupid." Canez, Jr. testified that, as he sat in the courtroom at that moment, he remembered his father making that precise statement to him.

### B. Robbery of Katherine Williams

In April 2010, Canez started dating Katherine Williams. The two lived together from April to July 2010 and again from October 2010 to January 2011. In November 2010, they were living at the La Quinta Inn in downtown Fresno. During their relationship, Canez would use alcohol and drugs virtually every day.

On the night of November 5, 2010, Williams and Canez got into a "verbal" and "physical" argument in their hotel room. Williams "bolted out" of the room after maneuvering around Canez, who was aggressively blocking her with his chest and trying to push her toward the back of the room. Canez had been physically abusive on prior occasions, so Williams wanted to get to the security guard at the hotel's "help desk." Canez, however, chased her down an external corridor, eventually grabbing her arm from behind, turning her around, and pushing her up against a wall.

Williams felt she could not get away but was yelling for help; she was afraid of Canez because of prior experiences with him. Canez was yelling and screaming "right in [Williams's] face," demanding the keys to her rental car. Looking for her keys or other property, Canez went through her pockets, grabbing, without her permission, her driver's license, ATM card, credit card, and medical insurance cards. Thereafter, Canez "stormed away," telling her to "stay the fuck away from [him] and [his] son." Williams immediately "headed for the security guard," who called the police. Fresno Police Officer Caleb Janca questioned Williams shortly after the incident. She told him Canez had pinned her against the wall and then reached into her pocket.

Canez subsequently used, without permission, Williams's credit card to stay at a different hotel. Eventually, after followup work by the police, Williams was able

to retrieve her cards, except for the credit card, at the police station. As for her credit card, Williams subsequently retrieved it from the front desk of the hotel at which Canez had used it.

### C. Domestic violence incidents involving Canez and Williams

#### 1. Events of December 9, 2010

By December 2010, Williams and Canez had moved into a house on East Kerckhoff Avenue in Fresno. On December 9, 2010, the two argued and Williams eventually had to go to the hospital "because of being hit ... by ... Canez." Canez had repeatedly hit her on her left leg knowing she had a bad knee from a previous fall. Thereafter, Canez made "threatening" and "violent" calls, and sent threatening texts, to Williams. He accused her of sleeping with other men and threatened to tell the police she was buying drugs.

#### 2. Events of January 6–7, 2011

On January 6, 2011, Canez got agitated after having a beer, accused Williams in vulgar terms of infidelity, and slapped her in the face and head. When Williams attempted to get away, he hit her on the leg several times and also blocked the door. When Williams nonetheless managed to escape to the outside through a back door, Canez yanked her, by the hair, from a pole she was clinging to and then pushed her by the neck back into the house.

Williams contacted a staff member at the Marjaree Mason Center, a women's shelter and advocacy organization, the staff member in turn alerted the police. Fresno Police Officers Loren Kasten and Brent Willey went to the Kerckhoff residence on January 7, 2011, to conduct a welfare check. Upon arrival, they announced their presence but received no response. Eventually, Kasten, looking through a window, saw Canez peer "around the corner from the kitchen, look at [Kasten] and immediately go back into the kitchen." Kasten then kicked in the front door, the officers entered the house and arrested Canez.

#### 3. Events of January 22–23, 2011

Canez and Williams had another altercation around midnight on January 22, 2011. Canez had ingested alcohol and drugs that night. Williams testified, "[Canez] was arguing, saying he had a lot of hoes that would want him out there and they're just waiting for him." Williams said she "just told him, go ahead and go." The argument continued to escalate with Canez saying that Williams "had been with other men, that if he was going to go back to prison, he's going for a reason, that he was going to kill [her], mess up [her] face," among other threats.

As the night progressed into the predawn hours of January 23, 2011, Canez grabbed Williams by the hair and tried, multiple times, to force her to perform oral sex, while shouting graphic vulgarities and obscenities at her. Williams testified that when she resisted, matters "started to really escalate." She explained: "he got on top of me and was—had me in a choke, like he was choking me and telling me he was going to kill me, spitting in my face." Williams was sitting on the bed, with her back up against a wall, and Canez was "straddling" her; she was "holding the hands trying to, you know, loosen it up." Williams testified that Canez "said many times, 'I'm going to kill you.'" He also punched her with his fist on her right cheek, which "just immediately ballooned out." When she had to go to the bathroom, Canez "grabbed [her] by the back of [her] neck and [her] hair and [her] shirt and walked [her] into the bathroom, and he hit [her] again in there, full-fisted, on [her] forehead." Williams said she "felt completely trapped."

Afterwards, Canez "got back on [Williams] and [placed her] in a choking position," saying, over and over again, that he was "going to kill [her]." At about 4:00 a.m., after Canez had passed out, Williams "got up very quietly, put on a pair of pants and ran to the neighbor's house" to call 911. She then went to the hospital for treatment of her injuries. Photographs taken at the hospital showed extensive bruising and swelling on her face. Despite feeling "very fearful," Williams returned to the Kerckhoff house after the hospital visit because she needed to sleep. Williams was feeling woozy from her injuries, as if she had suffered a concussion. Canez, Jr. came over a little later, intending to spend the night at the house.

Around midnight, Canez "broke into the house" through the front door, which was braced after the police had kicked it in. Williams and Canez, Jr. were in the living room, each on a different couch. Williams testified: "I was laying on the couch, and it was just a burst, and then [Canez was] hitting me saying, 'Where is he? Where did you put him? Where is he?' And I was able to jump up from the couch and go around the coffee table, and that's when he hit me and broke my nose." Canez continued to hit her all over her body, including her arms and chest.

Williams explained that Canez, Jr. then confronted his father, and she "ran for the opening in the door and ... ran out to the front of the house." She stopped on the sidewalk out front, "bleeding everywhere." Canez, Jr. and Canez came outside and tussled on the grass for about five minutes. Canez then "storm [ed] off" while Canez, Jr. tried to help Williams. Williams testified that as Canez walked away, "he was turning around, flipping us off and saying, 'I'm going to burn down the mother fucking house, you mother fuckers.' That's exactly what he said." When Canez made the threat to burn the house down, Williams was "watching [him] carefully," because she feared he would "get in the car and run [her and Canez, Jr.] over." Thereafter, Williams called 911 and returned to the hospital[][6] for treatment of her injuries.[7]

Along with Williams, Canez, Jr. testified about Canez's assault on Williams in the living room of the Kerckhoff home on January 23, 2011. Canez, Jr. corroborated Williams's account. He said that Canez "came barging" into the house and "just started hitting [Williams] like a gorilla kind of, just like hitting her real hard." Canez also swung at Canez, Jr. such that Canez, Jr. "was scared of him at that point." Canez, Jr. testified that Williams was "running out of the house," saying, "Manuel, help me," to Canez, Jr. Canez, Jr. further explained:

"She's coming out. [Canez] passes me up and he's going after her. And she's like, 'Manuel, help me.' So I ran. By then, I got enough courage to hit him. So I was going to hit him, and he saw me coming and he ran this way, and I got in front of her, and pretty much I was like—he was like coming back at me, and I was, 'Come on, mother fucker.' And he was like, 'You know, you're not even worth it.' And he just kind of ... [¶] ... just kind of walk[ed] away, and then he [was] just yelling things as he [was] walking away."

---

[6] Evidence at the preliminary hearing indicated that Canez, Jr. went to the hospital with Williams. He also told Investigator Floyd Wilding that when he left the hospital, he was wondering whether Canez might set the Kerckhoff house on fire, just as he had done, the previous year, to the apartment of Canez, Jr's mother, Sylvia Bernal.

[7] Photographs of Williams's injuries, taken at the hospital, were introduced into evidence. The photographs showed injuries to her nose, significant facial bruising and swelling, and a black, swollen eye. Her nose needed stitches. Williams testified the swelling and bruises took weeks to subside. Her nose remained disjointed and a "ball" in her cheek persisted.

Within two or three hours after Canez threatened to set the house on fire as he walked away, an active fire did in fact break out at the residence. After that day, Williams did not maintain any relationship with Canez.

## D. *Kerckhoff house fire*

Agapito Martinez, a fire investigator and firefighter for the City of Fresno, testified that he was dispatched to the Kerckhoff house at 3 a.m. on January 24, 2011, and found "fire crews actively inside the house doing some type of suppression activity." After the fire was extinguished, Martinez commenced an investigation into the cause of the fire. He described the process as "looking for the least amount of fire damage, working towards the most" and sweeping the entire house looking for evidence of possible ignition sources, such as " candles, incense, smoking materials, cigarette butts, discarded matches, lighters, any type of electrical instruments ..., light fixtures, electrical outlets, anything plugged into those electrical outlets." He testified that the "heavier smoke demarcation lines" would be found "near the actual origin or room origin of the fire" because the smoke is "more concentrated in those areas." Martinez stated that greater damage in a particular area generally reflects the fact that the fire has been burning in that area for a longer time.

Here, his investigation led him from the front of the house "into the kitchen." Although he found smoke damage or staining in the house's front rooms, it was "darker" in the kitchen, showing the fire's direction of travel was back to front. Martinez's investigation next led him past the kitchen to a bedroom in the back northwest corner of the house. Based on fire patterns on the doorjamb and the heavy fire damage within the room, he determined this bedroom was the room where the fire originated. Martinez explained, with reference to the specific fire pattern on the doorjamb:

> "It just shows where, one, as the heat from the fire is exiting out the door, escaping out of the doorway, the way that heat escapes from the inside to the outside, it creates fire patterns as a result of actual direct flame contact. In this particular case, because of the charring, [it] will show the direction of travel where that fire came from [i.e., in this case, from within the bedroom]."

Martinez testified that once he had identified the room where the fire originated, he "look[ed] for [the] ignition source that caused that fire within that room." Eventually, based on concentrated fire damage, Martinez determined the fire had originated along the east wall of the back bedroom. He examined every potential ignition source within the bedroom but could not identify any ignition source in that area. He was able to rule out an oxygen canister, a cable modem, light fixtures, and electrical outlets present in the room as possible ignition sources. Although paint cans were found in the bedroom, there was no indication that they were contributing factors to the fire as they were sealed and not compromised in any way. Martinez also determined there were no significant weather concerns on the night in question that would have contributed to a fire; on the contrary the night "was cold and foggy."

Martinez decided to call for a dog trained to detect accelerants. Under the circumstances, and to the extent any accelerant was used to ignite the fire, he believed the dog could help identify an ignition source and point of origin for the fire. Martinez explained: "[I]f someone were to pour gasoline, kerosene, what have you, whatever ignitable liquid there would be, that stuff would saturate whatever it's put on. Well, remnants of that will remain that maybe the human

nose couldn't smell. There's all other machines out there that we can utilize to pick up on those odors, but a dog specifically can pick up on stuff that would fall through the cracks or cracks embedded into the actual subfloor. So it would pick up on those things."

With reference to Callie, the "arson dog" utilized in this case, Martinez explained: "[W]ell, what the dog does once in this case she scents or picks up on an ignitable liquid, as she's trained to do, she will sit down, in which case the dog handler will reward her with a little bit of food, and he will throw a golf tee down to indicate where she hit on." Martinez testified that, in this instance, Callie alerted in four separate spots inside the back bedroom. Martinez marked the four spots in a diagram of the bedroom that he made, which was admitted into evidence. Martinez also collected debris samples from the areas where Callie alerted and forwarded them to the Department of Justice (DOJ) for chemical analysis. He had not yet received the results of any tests conducted by DOJ "to back up" the dog's alerts.

Martinez concluded, based on his investigation as a whole, that the fire at the Kerckhoff house was arson. He explained his opinion was "based on the fire patterns, what I have, the lack of a competent ignition source, and what I identified as the area of origin, the presence of ignitable liquids, as well as the [witness] statements that I received from Investigator Wilding." Martinez clarified, however, that had he relied *only* on the fire patterns and actual physical evidence *that he saw* at the scene, his opinion would remain that this was an incendiary or arson fire.

Canez, 2017 WL 1150703, at *1–7 (footnotes in original).

### III.

### STANDARD OF REVIEW

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. The challenged convictions arise out of Fresno County Superior Court, which is located within the Eastern District of California. 28 U.S.C. § 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997) (en banc). The instant petition was filed after the enactment of AEDPA and is therefore governed by its provisions.

///

Under AEDPA, relitigation of any claim adjudicated on the merits in state court is barred

unless a petitioner can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law, as
> determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in the
> State court proceeding.

28 U.S.C. § 2254(d); Harrington v. Richter, 562 U.S. 86, 97–98 (2011); Lockyer v. Andrade, 538

U.S. 63, 70–71 (2003); Williams, 529 U.S. at 413.

As a threshold matter, this Court must "first decide what constitutes 'clearly established

Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71

(quoting 28 U.S.C. § 2254(d)(1)). In ascertaining what is "clearly established Federal law," this

Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as

of the time of the relevant state-court decision." Williams, 529 U.S. at 412. "In other words,

'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles

set forth by the Supreme Court at the time the state court renders its decision." Id. In addition,

the Supreme Court decision must "'squarely address [] the issue in th[e] case' or establish a legal

principle that 'clearly extend[s]' to a new context to the extent required by the Supreme Court in

. . . recent decisions"; otherwise, there is no clearly established Federal law for purposes of

review under AEDPA. Moses v. Payne, 555 F.3d 742, 754 (9th Cir. 2009) (quoting Wright v.

Van Patten, 552 U.S. 120, 125 (2008)); Panetti v. Quarterman, 551 U.S. 930 (2007); Carey v.

Musladin, 549 U.S. 70 (2006). If no clearly established Federal law exists, the inquiry is at an

end and the Court must defer to the state court's decision. Musladin, 549 U.S. 70; Wright, 552

U.S. at 126; Moses, 555 F.3d at 760.

If the Court determines there is governing clearly established Federal law, the Court must

then consider whether the state court's decision was "contrary to, or involved an unreasonable

application of, [the] clearly established Federal law." Lockyer, 538 U.S. at 72 (quoting 28 U.S.C.

§ 2254(d)(1)). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the

state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question

of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 412–13; see also Lockyer, 538 U.S. at 72. "The word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite in character or nature,' or 'mutually opposed.'" Williams, 529 U.S. at 405 (quoting Webster's Third New International Dictionary 495 (1976)). "A state-court decision will certainly be contrary to [Supreme Court] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases." Id. If the state court decision is "contrary to" clearly established Supreme Court precedent, the state decision is reviewed under the pre-AEDPA de novo standard. Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008) (en banc).

"Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413. "[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411; see also Lockyer, 538 U.S. at 75–76. The writ may issue only "where there is no possibility fair minded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents." Richter, 562 U.S. at 102. In other words, so long as fair minded jurists could disagree on the correctness of the state court's decision, the decision cannot be considered unreasonable. Id. If the Court determines that the state court decision is objectively unreasonable, and the error is not structural, habeas relief is nonetheless unavailable unless the error had a substantial and injurious effect on the verdict. Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).

The court looks to the last reasoned state court decision as the basis for the state court judgment. Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011); Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). If the last reasoned state court decision adopts or substantially incorporates the reasoning from a previous state court decision, this court may consider both decisions to ascertain the reasoning of the last decision. Edwards v. Lamarque, 475 U.S. 1121, 1126 (9th Cir. 2007) (en banc). "When a federal claim has been presented to a state court and the

state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." <u>Richter</u>, 562 U.S. at 99. This presumption may be overcome by a showing "there is reason to think some other explanation for the state court's decision is more likely." <u>Id.</u> at 99–100 (citing <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 803 (1991)).

Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d). <u>Stanley</u>, 633 F.3d at 860; <u>Himes v. Thompson</u>, 336 F.3d 848, 853 (9th Cir. 2003). "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." <u>Himes</u>, 336 F.3d at 853. While the federal court cannot analyze just what the state court did when it issued a summary denial, the federal court must review the state court record to determine whether there was any "reasonable basis for the state court to deny relief." <u>Richter</u>, 562 U.S. at 98. This court "must determine what arguments or theories ... could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." <u>Id.</u> at 102.

## IV.

## REVIEW OF CLAIMS

### A. Destruction of Evidence

In his first claim for relief, Petitioner asserts that he was denied due process by the destruction of the potentially exculpatory or potentially useful debris evidence. (ECF No. 1 at 5).[8] To the extent Petitioner asserts that trial counsel was ineffective with respect to the destruction of evidence issue, (ECF No. 1 at 19), the ineffective assistance of counsel claim is addressed in section IV(E), *infra*. Respondent argues that the state court reasonably rejected Petitioner's destruction of evidence claim. (ECF No. 18 at 24).

---

[8] Page numbers refer to ECF page numbers stamped at the top of the page.

Petitioner raised the destruction of evidence claim on direct appeal to the California Court of Appeal, Fifth Appellate District, which denied the claim in a reasoned decision. The California Supreme Court summarily denied Petitioner's petition for review. As federal courts review the last reasoned state court opinion, the Court will "look through" the California Supreme Court's summary denial and examine the decision of the California Court of Appeal. See Brumfield v. Cain, 135 S. Ct. 2269, 2276 (2015); Johnson v. Williams, 568 U.S. 289, 297 n.1 (2013); Ylst, 501 U.S. at 806.

In denying the destruction of evidence claim, the California Court of Appeal stated:

Canez argues his conviction for arson of the Gettysburg apartment must be dismissed because debris samples collected from spots where the hydrocarbon detector detected the presence of accelerant were destroyed before laboratory tests could be performed on them. We reject this contention because Canez has not shown that fire investigators acted in bad faith in connection with the destruction of the samples.

**A. Background**
At the preliminary hearing on September 8–9, 2011, Fresno Fire Department Investigator Floyd Wilding described the investigation into the Gettysburg apartment fire. He said his team collected fire debris samples to test for the presence of accelerants. Typically, the department submitted samples to the DOJ for testing but sometimes, in the interest of faster processing and testing, provided samples to the insurance company involved in the investigation. In this instance, the samples were turned over to the relevant insurance company because the company's investigator was present during the investigation and investigators believed the company would analyze the samples faster than would the DOJ. However, unbeknownst to the fire department, the insurance company decided to settle the case and discarded the samples. Wilding became aware of the destruction of evidence after the fact, when he called the insurance company seeking test results.

Specifically, Wilding testified as follows:

"Typically, when we process evidence, we process it through the [DOJ]. It takes them a very long time to process evidence. We're still waiting on the evidence from the fire that happened on January 24th of 2011 [i.e., the Kerckhoff house fire].

"If we have a private fire investigator on scene, they are working for the insurance companies and they have funding to get evidence analyzed much sooner. So at that time we [looked to] the insurance company—or the insurance company fire investigator [who] was on scene ... to have the evidence processed and he stated he would.

"When we packaged the evidence, he took it to be analyzed. And we assumed it was going to be analyzed. At a later date I called him to find out if they had found any accelerants in the sample, and he told me that the insurance company decided they didn't want to

pay any more money out on that incident and they were going to settle, and they didn't have any need for the evidence any longer and to discard it. The fire investigator failed to notify the Fire Department. And so we had no knowledge that the evidence was destroyed."[9]

Regarding the importance of the testing, Wilding said testing was "not necessary to determine the cause of the fire to be intentional." He explained that "debris may or may not have anything in it, but that in itself does not prove that the cause of the fire was arson or not arson."

Defense counsel filed a *Trombetta*/*Youngblood* motion to exclude evidence prior to trial. (*California v. Trombetta* (1984) 467 U.S. 479, 841 (*Trombetta*); *Arizona v. Youngblood* (1988) 488 U.S. 51, 52 (*Youngblood*).) Counsel argued the fire debris samples constituted material exculpatory evidence that the defense was precluded from testing because the samples were destroyed. The court noted, "I am aware that the *Trombetta* standard is clearly exculpatory prior to the time it was destroyed." The court then denied the motion, reasoning:

"I thought about it a lot and I am troubled, first of all, I guess by the fact that the chain of evidence would have been destroyed almost, anyway. I don't know why they decided to send it to an insurance company other than a [DOJ] laboratory.

"But I'm struggling with the fact that it's exculpatory because since there were no tests made on it, we don't know if it's exculpatory or not. I think the investigation, as represented by counsel, was that there was some type of fluid.

"Now, again, that is a dangerous area in that it is open for cross-examination. I have no anticipation that the investigator will misrepresent or testify improperly in court. So he will be open for cross-examination, and that is certainly a valid point for the defense to work on.

"But I just am not comfortable with the fact that it falls under *Trombetta*; so I will allow the investigation to be brought into evidence, and any opinion formed by that investigation, that it certainly can be attacked by the defense."

**B. Analysis**

In *Trombetta*, *supra*, 467 U.S. 479, the United States Supreme Court considered whether law enforcement must, in affording requisite due process to a defendant, preserve potentially exculpatory evidence on behalf of defendants. *Trombetta* held that the duty to preserve evidence is "limited to evidence that might be expected to play a significant role in the suspect's defense." (*Id*. at p. 488.) The high court applied a standard of "constitutional materiality" to define the type of evidence that triggers a constitutional duty to preserve evidence. (*Id*. at p. 489.) "To meet this standard of constitutional materiality, [citation], evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be

---

[9] Fire Investigator Christine Wilson also testified at trial that debris samples collected from the Gettysburg apartment were given to the insurance company for testing because the company's investigator was present during the fire department's investigation of the fire. She said the fire department would occasionally turn over debris samples to insurance companies when feasible and that this procedure was not out of the ordinary.

of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." (*Ibid.*) The *Trombetta* court also noted that the fact that authorities acted in good faith, and that the "record contain[ed] no allegation of official animus towards [the defendants] or of a conscious effort to suppress exculpatory evidence," militated against finding a due process violation in that case. (*Id.* at p. 488.)

In *Youngblood*, *supra*, 488 U.S. 51, the high court considered whether due process required law enforcement "to preserve evidentiary material that *might be useful* to a criminal defendant." (*Id.* at. p. 52, italics added.) The court held that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve *potentially useful evidence* does not constitute a denial of due process of law." (*Id.* at p. 58, italics added; *Illinois v. Fisher* (2004) 540 U.S. 544, 549 [*Youngblood's* bad faith requirement is based on the "distinction between 'material exculpatory' evidence and 'potentially useful' evidence"].) Evidence is "potentially useful" when "it could have been subjected to tests, the results of which might have exonerated the defendant." (*Youngblood*, *supra*, at p. 57.)

*Youngblood* explained that "requiring a defendant to show bad faith on the part of the police both limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases where the interests of justice most clearly require it, *i.e.*, those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant." (*Youngblood*, *supra*, 488 U.S. at p. 57.) Bad faith on the part of authorities involves " 'malice' " or a " 'design to seek an unconscionable advantage over the defendant.' " (*People v. Coles* (2005) 134 Cal.App.4th 1049, 1055.) *Youngblood* clarified, moreover, that "the police do not have a constitutional duty to perform any particular tests." (*Youngblood*, *supra*, at p. 59.)

In reviewing the denial of a *Trombetta/Youngblood* motion, we "must determine whether, viewing the evidence in the light most favorable to the superior court's finding, there was substantial evidence to support its ruling." (*People v. Roybal* (1998) 19 Cal.4th 481, 510.)

Canez argues the trial court's determination is erroneous under *Youngblood*, which is controlling. Specifically, he contends the trial court "erred in refusing to dismiss count one," i.e., the charge of arson of the Gettysburg apartment, because "the fire investigators' bad faith actions led to the loss or destruction of potentially useful evidence." Assuming the evidence at issue was "potentially useful" as defendant contends, the record reveals no evidence of bad faith on the part of the fire investigators. Accordingly, there was no error under *Youngblood* and we affirm Canez's conviction on this count.

Investigator Wilding testified that when a private investigator from the relevant insurance company was present at a fire investigation, City of Fresno investigators would sometimes entrust debris samples to the insurance company for testing, in the interest of faster and more efficient analysis. He explained he gave the debris samples from the Gettysburg apartment to the insurance company so as to more speedily obtain results of relevant tests. Wilding duly followed up with the insurance investigator regarding potential results, only to be informed the company had discarded the evidence without analyzing it or informing the fire department. Investigator Christine Wilson confirmed that the debris samples were given to the insurance company, evidently for quick analysis, and that the fire department would sometimes avail this option when the opportunity presented itself.

There is no indication the fire investigators turned the debris samples over to the insurance company because they believed the samples would exonerate Canez and consequently wanted them destroyed. On the contrary, the hydrocarbon detector had already positively detected accelerant on the samples and investigators had every reason to believe that chemical analysis would confirm the detector's findings. Investigator Wilson testified that in only two of 600 cases in which the hydrocarbon detector had signaled the presence of accelerant, had subsequent chemical analysis failed to confirm the presence of a specific accelerant.

There was also other significant evidence to support a reasonable expectation, on the part of the investigators, that chemical analysis would only confirm the hydrocarbon detector's findings. Canez had threatened to kill Bernal shortly before the fire broke out; the apartment was horribly vandalized after the domestic dispute between Bernal and Canez; transmission or gear oil was smeared all over the apartment; fire investigators ruled out any accidental or natural causes for the fire; Canez, Jr. told Investigator Wilding that Canez had admitted to him that he had set the fire; and Don MacAlpine, the deputy fire marshal supervising the investigation, believed, on the basis of his experience, that arson was often associated with domestic violence. Under these circumstances, fire investigators would reasonably have expected that the debris samples would yield additional inculpatory, rather than exculpatory, evidence and had no reason to wish them destroyed.

Furthermore, the fire investigators' reasoning that the insurance company would more efficiently process the evidence is validated by the record. At the time in question, it apparently did take a long time for DOJ to provide test results to the Fresno Fire Department in fire investigations. For example, Wilding testified at the preliminary hearing that he was still awaiting results from DOJ for any tests on samples from the Kerckhoff fire, which had happened nine months earlier. Nor did it appear that test results for samples from the Kerckhoff fire were forthcoming at the time of trial, another three years after the preliminary hearing.

In sum, the trial court properly denied Canez's *Trombetta/Youngblood* motion to dismiss count 1, i.e., the charge of arson of the Gettysburg apartment. There was no reason to anticipate the debris samples would exculpate Canez and, more importantly, there was no evidence of bad faith on the part of fire investigators.

Canez, 2017 WL 1150703, at *8–12 (footnote in original).

The clearly established federal law governing failure to preserve evidence claims is

California v. Trombetta, 467 U.S. 479 (1984), and Arizona v. Youngblood, 488 U.S. 51 (1988).

Sanders v. Cullen, 873 F.3d 778, 811 (9th Cir. 2017). In Trombetta, the Supreme Court declared:

Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means. Neither of these conditions is met on the facts of this case.

467 U.S. at 488–89 (internal citation omitted). In Youngblood, the Supreme Court held "that

1  unless a criminal defendant can show bad faith on the part of the police, failure to preserve

2  potentially useful evidence does not constitute a denial of due process of law." 488 U.S. at 58.

3  The Ninth Circuit has noted that "Youngblood's bad faith requirement dovetails with the first

4  part of the Trombetta test . . . . The presence or absence of bad faith turns on the government's

5  knowledge of the apparent exculpatory value of the evidence at the time it was lost or

6  destroyed." Sanders, 873 F.3d at 811 (internal quotation marks omitted) (quoting United States

7  v. Cooper, 983 F.2d 928, 931 (9th Cir. 1993)).

8      Here, the fire investigators themselves did not destroy the debris samples, and there is no

9  indication that the fire investigators turned over the debris samples to the insurance company "in

10  a calculated effort to circumvent the disclosure requirements established by Brady v. Maryland

11  and its progeny." Trombetta, 467 U.S. at 488. Investigators Wilding and Wilson testified that fire

12  investigators sometimes turn over samples to the insurance company for testing when the

13  opportunity was presented in the interest of quicker chemical analysis. (2 CT 323; 15 RT 1829).

14  The hydrocarbon detector had already positively detected accelerant in the kitchen and dining

15  room at the Kerckhoff house, and Investigator Wilson testified that in her experience only in two

16  cases out of six hundred did subsequent chemical analysis fail to determine what substance was

17  present in samples to which the hydrocarbon detector alerted. (15 RT 1823–25). Therefore,

18  although the debris samples conceivably could have been exculpatory, the information available

19  at the time the fire investigators turned over the debris samples to the insurance company

20  indicated that the chemical analysis would confirm the hydrocarbon detector's positive alerts.

21      Based on the foregoing, the Court finds that the state court's denial of Petitioner's

22  destruction of evidence claim was not contrary to, or an unreasonable application of, clearly

23  established federal law, nor was it based on an unreasonable finding of fact. Petitioner failed to

24  show the apparent exculpatory value of the debris samples at the time they were destroyed and

25  failed to show bad faith on the part of the fire investigators. The decision was not "so lacking in

26  justification that there was an error well understood and comprehended in existing law beyond

27  any possibility of fairminded disagreement." Richter, 562 U.S. at 103. Accordingly, Petitioner is

28  not entitled to habeas relief on his first claim, and it should be denied.

**B. Evidentiary Error**

In his second claim for relief, Petitioner asserts that the trial court erroneously permitted Investigator Martinez to present hearsay evidence in his testimony regarding the accelerant-sniffing dog and her handler. (ECF No. 1 at 7). Respondent argues that improper admission of evidence is state-law error and not cognizable in federal habeas and the state court's rejection of the Confrontation Clause argument was not objectively unreasonable. (ECF No. 18 at 30).

Petitioner raised this evidentiary error claim on direct appeal to the California Court of Appeal, Fifth Appellate District, which denied the claim in a reasoned decision. The California Supreme Court summarily denied Petitioner's petition for review. As federal courts review the last reasoned state court opinion, the Court will "look through" the California Supreme Court's summary denial and examine the decision of the California Court of Appeal. See Brumfield, 135 S. Ct. at 2276; Ylst, 501 U.S. at 806.

In denying Petitioner's challenge to the admission of evidence regarding the accelerant-sniffing dog and her handler, the California Court of Appeal stated:

> Canez challenges, on several fronts, the admission of evidence related to the accelerant-sniffing dog, Callie, summoned by Martinez, along with her handler, to the Kerckhoff house. Canez argues the evidence of the dog's alerts was inadmissible because the foundation regarding the reliability of this evidence was inadequate. He also contends that Martinez's testimony to the effect that Callie's handler marked the sites of her alerts with golf tees was inadmissible hearsay because the handler's actions constituted assertive conduct. Canez further argues that evidence related to the dog's alerts was inadmissible under the Confrontation Clause of the Sixth Amendment to the federal Constitution.[10] Finally, Canez contends that, since the trial court nonetheless admitted the evidence of the dog's alerts, it was required to instruct the jury to view this evidence with caution. He argues the trial court's failure to do so was prejudicial error. We need not resolve the merits of any of these claims because, even were we to assume the court erroneously admitted this evidence and failed to give a cautionary instruction as required, the error in admitting the evidence was harmless under any standard of prejudice.
>
> Here, the evidence supporting Canez's conviction for arson of the Kerckhoff house was extremely strong, both in terms of showing that the fire at the house was arson and in terms of showing that Canez was the perpetrator of the arson. Accordingly, as stated above, any error by the trial court in admitting evidence related to Callie's alerts, even in the absence of a cautionary instruction, was harmless under any standard of prejudice. (*People v. Watson* (1956) 46 Cal.2d

---

[10] It is not clear whether this claim encompasses simply the dog's alerts, the handler's actions in relation to the alerts, or both.

818, 836; *Chapman v. California* (1967) 386 U.S. 18, 24.) We will discuss the salient parts of the record below.

First, there was compelling evidence, aside from Callie's alerts, that the Kerckhoff house fire was caused by arson. Fire Investigator Martinez arrived at the Kerckhoff house while fire crews were still working to extinguish the fire. He determined the fire originated in a back bedroom. He ruled out an accidental cause for the fire based on the absence of a competent ignition source in the bedroom. He similarly ruled out a natural cause for the fire, noting that the "cold and foggy" weather that night was not a contributing factor. As Martinez explained, with other possibilities eliminated, the only reasonable conclusion regarding the cause of the fire was that it was arson.

Martinez backed up his conclusion that the fire was arson with compelling evidence, aside from Callie's alerts. Indeed, the "presence of ignitable liquids," as revealed by Callie's alerts, was only one of many factors Martinez relied on in reaching this conclusion. He also relied on the "fire patterns," "the area of origin," "the lack of a competent ignition source," and Williams's statements to investigators regarding events immediately preceding the fire (i.e., Canez's assaults on Williams and his explicit threat to burn down the house). Furthermore, Martinez clarified that had he relied *only* on the fire patterns and actual physical evidence *that he saw* at the scene, his opinion would remain that this was an incendiary or arson fire.

In short, Martinez conducted a thorough and broad ranging investigation that persuasively demonstrated that the cause of the fire at the Kerckhoff house was arson. Although the evidence of Callie's alerts was certainly relevant to this determination, there was an abundance of evidence, separate and apart from the alerts, which independently and convincingly revealed that the fire was caused by arson.

Next, there was also compelling evidence that Canez was the person responsible for the arson of the Kerckhoff house. The night before the fire broke out, Canez had terrorized and viciously attacked Williams, requiring her to seek emergency medical treatment for the injuries she sustained in the attack. Canez returned to the house the following night around midnight. He again brutally assaulted Williams, stopping only when Canez, Jr. physically intervened to ward him off. Canez briefly tussled with Canez, Jr. in the front yard of the house, then walked away, down the street. As he walked away, he explicitly threatened he would burn down the Kerckhoff house. Williams testified that Canez kept "turning around, flipping us off and saying, 'I'm going to burn down the mother fucking house, you mother fuckers.' That's exactly what he said." After Canez left, Williams again went to the hospital for treatment of additional injuries Canez had inflicted in the latest attack. The fire broke out at the Kerckhoff house while she was away, barely two to three hours after Canez had expressly threatened to burn the house down.

Finally, the jury also heard evidence that, the previous year, Canez had burned down the apartment of his ex-wife, Sylvia Bernal, after similarly subjecting her to a night of vicious domestic abuse. (See *People v. Robinson* (1995) 31 Cal.App.4th 494, 503 [evidence of two separate arsons that bore similar marks was properly admitted to show "identity"].) Canez, Jr. testified that Canez actually admitted to him that he intentionally burned down Bernal's apartment. The jury, in the instant case, convicted Canez of the arson of Bernal's apartment.

Leaving aside evidence of Callie's alerts, the record compellingly demonstrates that the fire at the Kerckhoff house was arson and that Canez was responsible for the arson. Accordingly, given the strength of the case against Canez, any error on the part of the trial court in admitting evidence related to Callie's alerts, even without a cautionary instruction, was harmless under any standard of prejudice. Since Canez was not prejudiced by admission of this evidence, irrespective of whether the court gave a cautionary instruction, we need not address the merits of his claims challenging the admissibility of this evidence or the court's failure to give a cautionary instruction with regard to this evidence.

Canez, 2017 WL 1150703, at *7–8 (footnote in original).

Here, the California Court of Appeal found that any error in admitting the contested evidence regarding the accelerant-sniffing canine and her handler was harmless beyond a reasonable doubt under the federal constitutional standard set forth in Chapman v. California, 386 U.S. 18 (1967). Under Chapman, "the test for determining whether a constitutional error is harmless . . . is whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" Neder v. United States, 527 U.S. 1, 15 (1999) (quoting Chapman, 386 U.S. at 24). The Supreme Court has held that when a state court's "Chapman decision is reviewed under AEDPA, 'a federal court may not award habeas relief under § 2254 unless *the harmlessness determination itself* was unreasonable.'" Davis v. Ayala, 135 S. Ct. 2187, 2199 (2015) (quoting Fry v. Pliler, 551 U.S. 112, 119 (2007)). That is, Petitioner must show that the state court's harmless error determination "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." Ayala, 135 S. Ct. at 2199 (internal quotation marks omitted) (quoting Richter, 562 U.S. at 103).

Apart from the evidence regarding the accelerant-sniffing canine and her handler, the other evidence admitted at trial credibly established that the fire at the Kerckhoff house was arson. Investigator Martinez, who was called out to the Kerckhoff house while the fire was still active, testified that the bedroom was the "room of origin," where the fire originated. (17 RT 2148, 2166, 2169, 2192). Although Martinez identified the east side of the bedroom as the specific area of origin, he was unable to identify an ignition source. (17 RT 2193–94). Martinez ruled out the oxygen unit, modem, light fixtures, and electrical outlets in the bedroom as ignition sources. (17 RT 2184–87, 2189–91). Martinez also ruled out natural sources of ignition as the

19

cause of the fire given that the weather was cold and foggy. (17 RT 2201). Besides the presence of ignitable liquids to which the canine alerted, Martinez relied on the fire patterns, the lack of a competent ignition source, the area of origin, and witness statements that Martinez received from Investigator Wilding to conclude that the cause of the fire was arson. (17 RT 2201).

Additionally, evidence adduced at trial pointed to Petitioner as the perpetrator of the arson. Around midnight on January 23, 2011, Petitioner assaulted Williams at the Kerckhoff house. Canez, Jr. intervened and scuffled with Petitioner for short time in the front yard before Petitioner walked away from the house. Williams testified that as Petitioner walked away, Petitioner "was turning around, flipping us off and saying, 'I'm going to burn down the mother fucking house, you mother fuckers.'" (16 RT 2031). After approximately two to three hours after Petitioner's explicit threat to burn down the house, the fire broke out at the Kerckhoff house during the pre-dawn hours of January 24, 2011.

Based on the foregoing, the state court reasonably concluded that given the strength of the other evidence introduced at trial, the admission of evidence related to the accelerant-sniffing dog and her handler did not prejudicially impact the jury's verdict. The California Court of Appeal's harmless error determination was not contrary to, or an unreasonable application of, Chapman, nor was it based on an unreasonable finding of fact. The decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." Richter, 562 U.S. at 103. Accordingly, Petitioner is not entitled to habeas relief on his second claim, and it should be denied.

**C. Robbery Conviction**

1. Sufficiency of the Evidence

In his third claim for relief, Petitioner asserts that there was insufficient evidence to convict him of robbery. (ECF No. 1 at 8). Respondent argues that Petitioner has not demonstrated that the state court's rejection of this claim was objectively unreasonable. (ECF No. 18 at 33). Petitioner raised the sufficiency of evidence claim with respect to his robbery conviction on direct appeal to the California Court of Appeal, Fifth Appellate District, which denied the claim in a reasoned decision. The California Supreme Court summarily denied

Petitioner's petition for review. As federal courts review the last reasoned state court opinion, the Court will "look through" the California Supreme Court's summary denial and examine the decision of the California Court of Appeal. See Brumfield, 135 S. Ct. at 2276; Ylst, 501 U.S. at 806.

In denying the sufficiency of evidence claim with respect to the robbery conviction, the California Court of Appeal stated:

> Canez next contends there was insufficient evidence to support his robbery conviction for stealing Williams's credit card, driver's license, and medical insurance cards from her person, during the altercation at the La Quinta Inn in Fresno. We disagree.
>
> The standard of review for a challenge to the sufficiency of the evidence supporting a conviction is well established:
>
> > " 'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.... We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' " (*People v. D'Arcy* (2010) 48 Cal.4th 257, 293.)
>
> In California, the offense of robbery under section 211 is the "felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (§ 211; *People v. Gomez* (2008) 43 Cal.4th 249, 254–255.) A "felonious taking" means a taking with "the intent to steal," *People v. Bacon* (2010) 50 Cal.4th 1082, 1117, i.e., a taking with the intent to permanently deprive an owner of his property. (*People v. Torres* (1995) 33 Cal.App.4th 37, 50 [specific intent to steal, i.e., to permanently deprive an owner of his property, is required for robbery]; *People v. Ford* (1964) 60 Cal.2d 772, 792, overruled on other grounds by *People v. Satchell* (1971) 60 Cal.2d 772.) In sum, robbery entails a taking—motivated by an intent to steal—that is accomplished by means of force or fear. (*People v. Anderson* (2011) 51 Cal.4th 989, 994 [" 'the act of force or intimidation by which the taking is accomplished in robbery must be motivated by the intent to steal' "].) Accordingly, robbery has the following elements: the defendant (1) took possession of property not his own, (2) from another, (3) against that person's will, (4) using force or fear to effect the taking or to prevent resistance to it, and (5) with the specific intent to permanently deprive the owner of his property. (*People v. Lewis* (2008) 43 Cal.4th 415, 464, rejected on another ground by *People v. Black* (2014) 58 Cal.4th 912; *People v. Marshall* (1997) 15 Cal.4th 1, 34.)

Canez argues:

> "The record in this case does not show the taking was motivated by the intent to deprive Williams permanently, or even temporarily, of the various cards in her pocket. The incident grew out of one of the couple's not-infrequent arguments: Williams left the motel room, with Canez following, demanding the keys to the rental car. When he reached into Williams' pocket, he was looking for the keys, not for Williams' other personal property.

To the extent Canez argues there is insufficient evidence of robbery because his use of force or fear was motivated by his intent to steal Williams' car keys rather than her credit card and driver's license, this argument is foreclosed by *People v. Brito* (1991) 232 Cal.App.3d 316 (*Brito* ). *Brito* rejected the defendant's claim that there was insufficient evidence of robbery of the victim's car where the defendant had intended only to steal the victim's personal property, but, after the victim fled, took his car as well. *Brito* held there was "no rationale for limiting the scope of the robbery only to the specific items on which the defendant has focused at the time he initially applies the force" as opposed to other "items he identifies during the same transaction." (*Id.* at pp 325–326 & p. 326, fn. 8.) In light of *Brito's* holding, cited in the People's brief, Canez abandoned this argument in his reply brief.

To the extent Canez argues there was no felonious taking in this case because "his intent in accosting Williams was to take whatever she had temporarily," this argument is also unavailing. Although the requirement of a felonious taking is " 'often summarized as the intent to deprive another of the property permanently,' " this requirement is also "satisfied by the intent to deprive temporarily but for an unreasonable time so as to deprive the person of a major portion of [the property's] value or enjoyment.' " (*People v. Aguilera* (2016) 244 Cal.App.4th 489, 500 (*Aguilera*), quoting *People v. Avery* (2002) 27 Cal.4th 49, 58.) In *Aguilera*, the defendant took his wife's cell phone, in the midst of his violent assault on her, to prevent her from calling the police for assistance. (*Aguilera*, *supra*, at pp. 501–502.) The court affirmed the defendant's conviction for robbery, holding that the evidence was sufficient to prove that in taking the phone, the defendant intended to deprive his wife of it temporarily but for an unreasonable period of time, so as to deprive her of a major portion of its value or enjoyment. Similarly, here the evidence was sufficient to show that Canez deprived Williams of her driver's license and credit card at a time when she was vulnerable and effectively shut out of the hotel room that was her home, thereby unreasonably depriving her of a major portion of the property's value or enjoyment.

In any event, Canez never voluntarily returned any of the property to Williams, nor was there any indication that he intended to, and a reasonable juror could also properly find, in light of these facts as well as Canez's actions reflected in the record as a whole, that he intended to permanently deprive Williams of her property at the time he took it.

Canez, 2017 WL 1150703, at *12–13.

The Supreme Court has held that when reviewing a sufficiency of the evidence claim, a court must determine whether, viewing the evidence and the inferences to be drawn from it in the

light most favorable to the prosecution, any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979). A reviewing court "faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." <u>Id.</u> at 326. State law provides "for 'the substantive elements of the criminal offense,' but the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law." <u>Coleman v. Johnson</u>, 566 U.S. 650, 655 (2012) (quoting <u>Jackson</u>, 443 U.S. at 319).

"'After AEDPA, we apply the standards of <u>Jackson</u> with an additional layer of deference' to state court findings." <u>Ngo v. Giurbino</u>, 651 F.3d 1112, 1115 (9th Cir. 2011) (alteration omitted) (quoting <u>Juan H. v. Allen</u>, 408 F.3d 1262, 1274 (9th Cir. 2005)). As the Supreme Court has stated:

> <u>Jackson</u> . . . makes clear that it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury. What is more, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was "objectively unreasonable."

<u>Cavazos v. Smith</u>, 565 U.S. 1, 2 (2011) (per curiam) (quoting <u>Renico v. Lett</u>, 559 U.S. 766, 773 (2010)).

Petitioner argues that his taking of Williams's credit card was in good faith so that he could get a hotel room to stop the argument between himself and Williams. Petitioner asserts that he never intended to deprive Williams of her property permanently, as evidenced by the fact that the property was returned to her the next day. Petitioner also asserts that he never intended to deprive Williams of her property temporarily but for an unreasonable period of time so as to deprive her of a major portion of its value or enjoyment, as evidenced by the fact that Williams was not shut out of her hotel room. (ECF No. 1 at 8.)

Although Petitioner points to the fact that Williams's property was returned to her the next day in support of his argument, the Court notes that there is nothing in the record that

establishes Petitioner voluntarily returned or intended to voluntarily return the property. Rather, Williams was informed that she could pick up her license and cards at the police station and retrieved one credit card from a hotel clerk at a different hotel than the one at which Williams was staying. (16 RT 1957, 1959–60). Petitioner also asserts that Williams was not shut out of her hotel room, but the state court decision was based in part on a determination that "the evidence was sufficient to show that Canez deprived Williams of her driver's license and credit card at a time when she was vulnerable and *effectively* shut out of the hotel room that was her home, thereby unreasonably depriving her of a major portion of the property's value or enjoyment." Canez, 2017 WL 1150703, at *13 (emphasis added). Williams testified that after Petitioner grabbed everything from her pocket, "the last I saw him, he was walking back up the stairs. And I ran for the . . . I headed for the security guard." (16 RT 1953). Based on the record, it was reasonable to conclude that Williams was effectively shut out of her hotel room in light of the altercation, Williams's feelings of fear and vulnerability, and Petitioner walking back upstairs (presumably to the hotel room).

"When the deference to state court decisions required by § 2254(d) is applied to the state court's already deferential review," Cavazos, 565 U.S. at 7, the Court finds that the state court's decision denying Petitioner's sufficiency of evidence claim with respect to Petitioner's robbery conviction was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of fact. The decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103. Accordingly, Petitioner is not entitled to habeas relief on his sufficiency of the evidence claim, and it should be denied.

2. Trial Court's Failure to Instruct on Grand Theft From a Person

In his third claim for relief, Petitioner also asserts that the trial court erroneously failed to *sua sponte* instruct the jury on grand theft from a person, a lesser-included offense of robbery. (ECF No. 1 at 8). Respondent argues that the instruction claim is unexhausted because it was not presented to the California Supreme Court, and that Petitioner has not demonstrated that the state court's rejection of this claim was objectively unreasonable. (ECF No. 18 at 33).

Although this claim was raised on direct appeal to the California Court of Appeal, the claim was not raised in the California Supreme Court, and thus, implicates exhaustion concerns.[11] However, pursuant to 28 U.S.C. § 2254(b)(2), the Court may deny an unexhausted claim on the merits "when it is perfectly clear that the [petitioner] does not raise even a colorable federal claim." Cassett v. Stewart, 406 F.3d 614, 624 (9th Cir. 2005) (adopting the standard set forth in Granberry v. Greer, 481 U.S. 129, 135 (1987)).

In Beck v. Alabama, the Supreme Court held that due process is violated in a *capital* case "when the jury was not permitted to consider a verdict of guilt of a lesser included non-capital offense, and when the evidence would have supported such a verdict." 447 U.S. 625. 627 (1980). Beck expressly declined to decide whether due process would require giving a lesser included offense instruction in non-capital cases. Id. at 638 n.14. The Ninth Circuit has declined to extend Beck to non-capital cases and held that "the failure of a state trial court to instruct on lesser included offenses in a non-capital case does not present a federal constitutional question." Windham v. Merkle, 163 F.3d 1092, 1106 (9th Cir. 1998) (citing Turner v. Marshall, 63 F.3d 807, 819 (9th Cir. 1995)). However, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense, including "entitle[ment] to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor." Mathews v. United States, 485 U.S. 58, 63 (1988). See Solis v. Garcia, 219 F.3d 922, 929 (9th Cir. 2000) (citing Bashor v. Risley, 730 F.2d 1228 (9th Cir. 1984)) (noting that "the refusal by a court to instruct a jury on lesser included offenses, when those offenses are consistent with defendant's theory of the case, may constitute a cognizable habeas claim").

Here, grand theft from a person was not consistent with the defense's theory of the case and thus, Petitioner was not deprived of a meaningful opportunity to present a complete defense. In closing, defense counsel attacked the credibility of Ms. Williams, noting her bipolar disorder, inconsistent statements, and the lack of corroboration of her story regarding what occurred at the

---

[11] A petitioner in state custody who is proceeding with a petition for writ of habeas corpus generally must exhaust state judicial remedies. 28 U.S.C. § 2254(b)(1). The exhaustion doctrine is based on comity to the state court and gives the state court the initial opportunity to correct the state's alleged constitutional deprivations. Coleman v. Thompson, 501 U.S. 722, 731 (1991); Rose v. Lundy, 455 U.S. 509, 518 (1982).

La Quinta Inn on November 5, 2010. (17 RT 2278–79). Defense counsel stated: "We don't know what happened. We know something happened, but we don't know what happened. They want you to guess, and you can't do that." (17 RT 2279–80). Such an argument—that there is insufficient credible evidence to determine what actually occurred at the La Quinta Inn on November 5, 2010—is not consistent with the lesser-included offense of grand theft from a person. Defense counsel also argued, in the alternative, that there was no evidence to establish that Petitioner intended to permanently deprive Williams of her property. (17 RT 2280). Again, such an argument is not consistent with the lesser-included offense of grand theft from a person, which also requires "that the defendant must have 'the specific intent at the time of the taking to permanently deprive the owner of the property.'" In re Jesus O., 40 Cal. 4th 859, 867 (Cal. 2007) (citation omitted).

Petitioner was not deprived of a meaningful opportunity to present a complete defense, and "the failure of a state trial court to instruct on lesser included offenses in a non-capital case does not present a federal constitutional question." Windham, 163 F.3d at 1106. As it is "perfectly clear" that Petitioner fails to raise a colorable federal claim, the Court may deny Petitioner's instructional error claim on the merits pursuant to 28 U.S.C. § 2254(b)(2).

**D. Fourth Claim for Relief**

In his fourth claim for relief, Petitioner asserts that he has been subject to discriminatory prosecution. (ECF No. 1 at 10). In support of this claim, Petitioner alleges that the judge who conducted Petitioner's trial released, in a separate case, one of the judge's acquaintances who was charged with domestic violence. In the answer, Respondent argues that this claim is unexhausted, but should be denied on the merits because it is not colorable. (ECF No. 18 at 39–40). In the traverse, however, Petitioner appears to assert a claim of judicial bias or misconduct rather than of selective prosecution. (ECF No. 22 at 50). Petitioner attached to the traverse a copy of a letter from his appellate counsel that indicated Petitioner previously sought to disqualify the trial judge and mentioned extensive pretrial publicity. (ECF No. 22 at 52).

Neither selective prosecution nor judicial misconduct was presented to the California Supreme Court, (LD 35), and thus, this claim is unexhausted. However, pursuant to 28 U.S.C.

§ 2254(b)(2), the Court may deny an unexhausted claim on the merits "when it is perfectly clear that the [petitioner] does not raise even a colorable federal claim." Cassett, 406 F.3d at 624.

### 1. Selective Prosecution

The Supreme Court has recognized that "the Government retains 'broad discretion' as to whom to prosecute," Wayte v. United States, 470 U.S. 598, 607 (1985) (quoting United States v. Goodwin, 457 U.S. 368, 380 n.11 (1982)), and that "so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion," Bordenkircher v. Hayes, 434 U.S. 357, 364 (1978) (footnote omitted). "This broad discretion rests largely on the recognition that the decision to prosecute is particularly ill-suited to judicial review." Wayte, 470 U.S. at 607. However, "a prosecutor's discretion is 'subject to constitutional constraints,'" such as whether the decision to prosecute was "based on 'an unjustifiable standard such as race, religion, or other arbitrary classification.'" United States v. Armstrong, 517 U.S. 456, 464 (1996) (first quoting United States v. Batchelder, 442 U.S. 114, 125 (1979); then quoting Oyler v. Boles, 368 U.S. 448, 456 (1962)). Selective prosecution claims are governed by ordinary equal protection standards, which require Petitioner to show that the prosecution had a discriminatory effect and was motivated by a discriminatory purpose. Armstrong, 517 U.S. at 465; Wayte, 470 U.S. at 608.

The basis for Petitioner's discriminatory prosecution claim appears to be the conduct of the trial judge in a wholly separate case allegedly involving one of the judge's acquaintances. However, the trial judge's conduct in a separate case has no bearing on *the prosecutor's* decision to prosecute Petitioner for the offenses in the instant case. As it is "perfectly clear" that Petitioner does not raise a colorable selective prosecution claim, the Court may deny this claim on the merits pursuant to 28 U.S.C. § 2254(b)(2).

### 2. Judicial Bias/Misconduct

In the traverse, Petitioner refers to "the misconduct and obstruction of justice by" the judge who oversaw his trial. (ECF No. 22 at 50). Although Petitioner does not set forth factual allegations regarding the alleged judicial misconduct and obstruction, Petitioner directs this

Court's attention to a letter written by his appellate counsel, which states in pertinent part:

> You mention the complaint against Judge Petrucelli. As you noted, you sought to disqualify him so your complaint is in the record. I have also located one Fresno Bee article about Judge Petrucelli's problems; it also mentioned that he was then in trial in your case. I have not found the extensive pretrial publicity you mention, but have not undertaken an exhaustive search.

(ECF No. 22 at 52).

At trial, Petitioner sought to disqualify the judge against the advice of Petitioner's counsel. The following exchange occurred:

> MR. MOORE: I was speaking with my client this morning. He showed me an article about an incident, I guess involving [Your Honor], and it had his name in the article. He wanted to do a point 6,[12] and I explained to him that it was too late at this stage since we have started trial. That's it.
>
> THE COURT: Anything else?
>
> MR. MOORE: No.
>
> THE COURT: All right. Does your client wish to be heard at all?
>
> THE DEFENDANT: Well, as far as what, Your Honor? As far as how I feel?
>
> THE COURT: I have nothing to say. It's up to you what you have to say. If you have nothing to say, that's fine.
>
> THE DEFENDANT: Well, at this point I just think that, you know, my trial is being unfair, you know, to your arbitrary decisions that you made. According to the newspaper clipping, this guy that you let go had pretty much the same charge as I did.
>
> THE COURT: Well, that's not true. So let's clarify that for the record.
>
> THE DEFENDANT: Well, I mean, as far as domestic violence, false imprisonment, things of that nature. But, you know, I just feel that my trial is being unfairly—unfair and, you know, by law and procedures, you know, and that you're just making personal decisions based on prejudice.
>
> THE COURT: Well, I have absolutely no idea what you're talking about. You're talking—if you have any specifics that you'd like to address—because nothing you've said makes any sense to me, quite frankly.

---

[12] This refers to California Penal Code section 170.6, which provides in pertinent part:

> A judge, court commissioner, or referee of a superior court of the State of California shall not try a civil or criminal action or special proceeding of any kind or character nor hear any matter therein that involves a contested issue of law or fact when it is established as provided in this section that the judge or court commissioner is prejudiced against a party or attorney or the interest of a party or attorney appearing in the action or proceeding.

Cal. Penal Code § 170.6(a)(1).

> Your attorney has discussed with you that 170.6 is exceptionally untimely. We are in the middle of trial. The fact that your name was in the newspaper, it will be continued to be in the newspaper, and almost every case that I have, especially of the magnitude of your charges, the reporters report on it, they report on the progress, and they report on the results. If, in fact, you're convicted and sentenced, they probably will report on that, too. So that certainly has no bearing on anything.
>
> Secondly, if you did read the article, they are allegations, they are going to be explained, and there certainly is no prejudice that attaches to you whatsoever in any way, shape, or form, even if, in fact, I would entertain a 170.6. But it is untimely, your attorney is correct, and I will not consider it. Thank you.

(16 RT 1890–92) (footnote added).

Although "most questions concerning a judge's qualifications to hear a case are not constitutional ones, because the Due Process Clause of the Fourteenth Amendment establishes a constitutional floor, not a uniform standard . . . the floor established by the Due Process Clause clearly requires a 'fair trial in a fair tribunal,' before a judge with no actual bias against the defendant or interest in the outcome of his particular case." Bracy v. Gramley, 520 U.S. 899, 904–05 (1997) (citations omitted). Judicial recusal is required when "the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable." Withrow v. Larkin, 421 U.S. 35, 47 (1975). "The Court asks not whether a judge harbors an actual, subjective bias, but instead whether, as an objective matter, the average judge in his position is likely to be neutral, or whether there is an unconstitutional potential for bias." Williams v. Pennsylvania, 136 S. Ct. 1899, 1905 (2016) (internal quotation marks and citation omitted). The Supreme Court has held that "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion." Liteky v. United States, 510 U.S. 540, 555 (1994) (citing United States v. Grinnell Corp., 384 U.S. 563, 583 (1966)).

As set forth above, it is unclear from the record and Petitioner does not make any specific factual allegations in the petition and traverse as to the trial judge's actions that constitute misconduct and obstruction of justice in Petitioner's case. To the extent that Petitioner asserts that the trial judge's denial to recuse himself violated due process, the Court finds that it is "perfectly clear" that Petitioner does not raise a colorable federal claim. Accordingly, the Court may deny this claim on the merits pursuant to 28 U.S.C. § 2254(b)(2).

### E. Ineffective Assistance of Counsel

Petitioner also asserts ineffective assistance of counsel for failure to: (1) adequately argue the destruction of evidence issue at trial, and (2) put on an adequate defense and investigate the mishandling of certain evidence. (ECF No. 1 at 17, 19, 21–22). Respondent argues that the ineffective assistance of counsel claims are unexhausted and should be denied as they are not colorable. (ECF No. 18 at 29, 40). Petitioner's ineffective assistance of counsel claims were not presented to the state courts, and thus, are unexhausted. However, pursuant to 28 U.S.C. § 2254(b)(2), the Court may deny an unexhausted claim on the merits "when it is perfectly clear that the [petitioner] does not raise even a colorable federal claim." Cassett, 406 F.3d at 624.

1. Legal Standard

The clearly established federal law governing ineffective assistance of counsel claims is Strickland v. Washington, 466 U.S. 668 (1984). In a petition for writ of habeas corpus alleging ineffective assistance of counsel, the court must consider two factors. Strickland, 466 U.S. at 687. First, the petitioner must show that counsel's performance was deficient, requiring a showing that counsel made errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment. Id. at 687. The petitioner must show that counsel's representation fell below an objective standard of reasonableness, and must identify counsel's alleged acts or omissions that were not the result of reasonable professional judgment considering the circumstances. Richter, 562 U.S. at 105 ("The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom.") (citing Strickland, 466 U.S. at 690). Judicial scrutiny of counsel's performance is highly deferential. A court indulges a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. Strickland, 466 U.S. at 687. A reviewing court should make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at that time." Id. at 689.

Second, the petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result would have been different. It is not enough "to show

that the errors had some conceivable effect on the outcome of the proceeding." Strickland, 466
U.S. at 693. "A reasonable probability is a probability sufficient to undermine confidence in the
outcome." Id. at 694. A court "asks whether it is 'reasonable likely' the result would have been
different. . . . The likelihood of a different result must be substantial, not just conceivable."
Richter, 562 U.S. at 111–12 (citing Strickland, 466 U.S. at 696, 693). A reviewing court may
review the prejudice prong first. See Pizzuto v. Arave, 280 F.3d 949, 955 (9th Cir. 2002).

    2.  Failure to Adequately Argue Destruction of Evidence Issue

    Petitioner asserts that trial counsel was ineffective for failing to adequately argue the
destruction of evidence issue. (ECF No. 1 at 17, 19). When Petitioner's pretrial Trombetta
motion was denied, the trial court stated:

> But I'm struggling with the fact that it's exculpatory because since there were no
> tests made on it, we don't know if it's exculpatory or not. I think the investigation,
> as represented by counsel, was that there was some type of fluid.
>
> Now, again, that is a dangerous area in that it is open for cross-examination. I
> have no anticipation that the investigator will misrepresent or testify improperly
> in court. So he will be open for cross-examination, and that is certainly a valid
> point for the defense to work on.
>
> But I just am not comfortable with the fact that it falls under Trombetta; so I will
> allow the investigation to be brought into evidence, and any opinion formed by
> that investigation, that it certainly can be attacked by the defense.

(14B RT 1637). Petitioner appears to argue that counsel disregarded the trial court's suggestion
and did not adequately attack the investigation during the course of trial. (ECF No. 1 at 19).

    The Court "must indulge a strong presumption that counsel's conduct falls within the
wide range of reasonable professional assistance; that is, the defendant must overcome the
presumption that, under the circumstances, the challenged action 'might be considered sound
trial strategy.'" Strickland, 466 U.S. at 689 (quoting Michel v. Louisiana, 350 U.S. 91, 101
(1955)). The Supreme Court has recognized that this "presumption has particular force where a
petitioner bases his ineffective-assistance claim solely on the trial record, creating a situation in
which a court 'may have no way of knowing whether a seemingly unusual or misguided action
by counsel had a sound strategic motive.'" Id. (quoting Massaro v. United States, 538 U.S. 500,
505 (2003)).

Here, Petitioner fails to overcome the strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. Defense counsel filed a pretrial Trombetta motion challenging the destruction of evidence. At trial, defense counsel specifically cross-examined pertinent prosecution witnesses regarding the investigation and the lack of laboratory chemical analysis to confirm the hydrocarbon detector's alerts. (15 RT 1826–27; 16 RT 1933–34). Additionally, as discussed in section IV(A), *supra*, the state court reasonably rejected Petitioner's destruction of evidence claim. Therefore, Petitioner has not established "that there is a reasonable probability that . . . the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

As it is "perfectly clear" that Petitioner fails to raise a colorable ineffective assistance of counsel claim with respect to counsel's alleged failure to adequately argue the destruction of evidence issue, the Court may deny this claim on the merits pursuant to 28 U.S.C. § 2254(b)(2).

3.  Failure to Investigate

Petitioner also asserts that trial counsel was ineffective for failing to investigate missing reports and "CD's and records that were mishandled." (ECF No. 1 at 21). Petitioner contends that if counsel had "investigated his case and inquired into missing reports," then the results of his trial would have been different. (Id.).

"[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Strickland, 466 U.S. at 690–91. Petitioner "must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Id. at 689. Here, Petitioner does not provide the Court with any allegations as to what information the missing reports and mishandled CD's and records contained. Therefore, Petitioner has failed overcome the presumption that his counsel's decision not to investigate was reasonable and failed to demonstrate that but for counsel's failure to investigate there was a reasonable probability that the result of the proceeding would have been different.

As it is "perfectly clear" that Petitioner fails to raise a colorable ineffective assistance of counsel claim with respect to counsel's failure to investigate, the Court may deny this claim on the merits pursuant to 28 U.S.C. § 2254(b)(2).

## V.

## RECOMMENDATION

Accordingly, the undersigned HEREBY RECOMMENDS that the petition for writ of habeas corpus be DENIED.

This Findings and Recommendation is submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within **THIRTY (30) days** after service of the Findings and Recommendation, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the objections shall be served and filed within fourteen (14) days after service of the objections. The assigned District Judge will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   __April 13, 2018__

_____

UNITED STATES MAGISTRATE JUDGE